[L.A. No. 31832. Oct. 28, 1985.]

JOSE L. CLEMENTE, an Incompetent Person, etc.,
Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

208

## COUNSEL

George Deukmejian and John K. Van de Kamp, Attorneys General, Michael Franchetti and Nelson Kempsky, Chief Deputy Attorneys General, Willard A. Shank and Richard Martland, Chief Assistant Attorneys General, Marvin Goldsmith, Assistant Attorney General, Robert H. Francis and Mark A. Weinstein, Deputy Attorneys General, for Defendants and Appellants.

Manuel Hidalgo for Plaintiff and Respondent.

## OPINION

**BROUSSARD, J.**—This case presents a unique cause of action as well as a somewhat complicated procedural history. Plaintiff Jose Clemente was severely injured when he was struck by a motorcycle while attempting to cross a street. The motorcyclist was never apprehended. Clemente brought suit against the State of California and Highway Patrol Officer Arthur Loxsom, alleging that Loxsom was negligent in failing to ascertain the identity of the motorcyclist.

After the trial court sustained defendants' demurrer to the complaint, the Court of Appeal reversed and remanded, holding that plaintiff could state a cause of action against Loxsom and the state. (*Clemente* v. *State of California* (1980) 101 Cal.App.3d 374, 379-380 [161 Cal.Rptr. 799], hereinafter *Clemente I.*) After amending his complaint in conformity with *Clemente I,* plaintiff proceeded to trial and obtained a $2,150,000.21 judgment. Defendants appeal.

### I. FACTS

On January 27, 1975, plaintiff was struck by a motorcycle while attempting to cross at an intersection. Officer Arthur Loxsom of the California Highway Patrol was on his way to freeway patrol when he was hailed by a passing motorist and directed to the scene of the accident. When Loxsom arrived at the scene, plaintiff was attempting to crawl out of the crosswalk and onto the sidewalk. He was being assisted by a group of bystanders. A man was pushing a motorcycle out of the street. Loxsom turned on his

flashers in order to indicate that an accident had occurred. Several people came up to him in order to tell him how the accident had happened. He called an ambulance and the Los Angeles Police Department (LAPD). He may have also directed traffic around the intersection.

The motorcyclist, along with a van driver who had been in the lane next to the motorcycle, also approached Loxsom. The van driver told Loxsom that he had stopped to allow plaintiff to cross but that the motorcyclist had not done so and had struck him. The motorcyclist admitted that he had hit plaintiff, explaining that he had not seen him. He asked Loxsom what he should do with the motorcycle, and Loxsom directed him to move it out of the street and place it near the curb. Loxsom told the motorcyclist not to leave the scene and to await the arrival of LAPD. Loxsom left before either the ambulance or LAPD arrived. He did not obtain the name or license of the motorcyclist or the license number of the motorcycle. He also did not get any identification from the van driver. The motorcyclist and the van driver left before LAPD arrived. Despite later efforts they were never found.

Loxsom never spoke to plaintiff or examined him to ascertain whether he was seriously injured. By the time he was taken to the hospital plaintiff had lapsed into a coma and was in critical condition. He suffered severe brain damage, and is paralyzed, unable to speak, incontinent and must depend upon others to attend to his daily needs.

## II. LAW OF THE CASE

Defendants contend that *Clemente I* was erroneously decided relying upon our subsequent decision in *Williams* v. *State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137] and other decisions and that Loxsom did not owe a duty to plaintiff to exercise due care in his investigation. We have concluded that the decision in *Clemente I* is law of the case, establishing Loxsom's duty to exercise due care.

In *Clemente I,* the court concluded that plaintiff could state a cause of action for negligent breach of a duty to exercise due care in the conduct of the investigation undertaken by Loxsom. The court stated: "The injury plaintiff alleged in this third amended complaint was the virtual destruction of any opportunity on his part to obtain compensation for his physical injuries from the apparent tortfeasor, the motorcyclist, by reason of the officer's negligence in the conduct of his investigation of the traffic accident in failing to obtain the motorcyclist's identity. What is involved under these allegations is not the discretion of Officer Loxsom in deciding whether to investigate the traffic accident, pursuant to the discretionary authority vested

in him by Vehicle Code section 2412 (see *McCarthy* v. *Frost* (1973) 33 Cal.App.3d 872, 874-857 [109 Cal.Rptr. 470]), but instead only his negligence in his conduct of the discretionary investigation. Neither the discretionary immunity of Government Code section 820.2, nor the more specific discretionary immunity of failure to enforce a statute (Gov. Code, §§ 821, 818.2) immunizes the officer and the state from the legal consequences of this negligence. (See *McCorkle* v. *City of Los Angeles* (1969) 70 Cal.2d 252, 261-262 [74 Cal.Rptr. 389, 449 P.2d 453].) Government, through its agents, is held to the same standard of care the law requires of private citizens in the performance of duties imposed or assumed. (See *Sava* v. *Fuller* (1967) 249 Cal.App.2d 281, 290 [57 Cal.Rptr. 312]; Gov. Code, § 815.2, subd. (a).)

"We think that possible liability of the officer and the state in this case is indicated by our reasoning in the aforementioned decision of this panel, *Mann* v. *State of California, supra,* [1977] 70 Cal.App.3d 773 [139 Cal.Rptr. 82]. There, we said that the lack of police protection immunity granted by Government Code section 845, extends essentially only to protection against crime and to that resulting from budgetary neglect. It does not extend to negligence as such. (*Id.,* at pp. 778-779.) There, we also said that a special relationship in tort law obtained between the California highway patrol officer there involved and the stranded motorists by reason of their dependence on his expertise. (*Id.,* at pp. 779-780.) Here, the completely disabled and apparently incompetent plaintiff was likewise completely dependent on Officer Loxsom following the traffic accident." (101 Cal.App.3d at pp. 379-380.)

In *People* v. *Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211], we explained the doctrine of the law of the case in this manner: " 'The doctrine of the law of the case is this: That where, upon an appeal, the supreme court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal, and, as here assumed, in any subsequent suit for the same cause of action, and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular.'

"The principle applies to criminal as well as civil matters (*People* v. *Durbin* (1966) 64 Cal.2d 474, 477 [50 Cal.Rptr. 657, 413 P.2d 433]; *Castiel* v. *Superior Court* (1958) 162 Cal.App.2d 710 [328 P.2d 476]), and to decisions of intermediate appellate courts as well as courts of last resort. 'Where a decision upon appeal has been rendered by a District Court of Appeal and the case is returned upon a reversal, and a second appeal comes

to this court directly or intermediately, for reasons of policy and convenience, this court generally will not inquire into the merits of said first decision, but will regard it as the law of the case.'" (See also *Price* v. *Civil Service Com.* (1980) 26 Cal.3d 257, 267, fn. 5 [161 Cal.Rptr. 475, 604 P.2d 1365]; *Davies* v. *Krasna* (1975) 14 Cal.3d 502, 507 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807]; *Talley* v. *Ganahl* (1907) 151 Cal. 418, 421 [90 P. 1049].)

■ However, the doctrine of law of the case which has been recognized as being harsh is merely a rule of procedure and does not go to the power of the court. It will not be adhered to where its application will result in an unjust decision. (*Di Genova* v. *State Board of Education* (1962) 57 Cal.2d 167, 179 [18 Cal.Rptr. 369, 367 P.2d 865]; *Subsequent Injuries Fund* v. *Ind. Acc. Com.* (1960) 53 Cal.2d 392, 395 [1 Cal.Rptr. 833, 348 P.2d 193].) The principal ground for making an exception to the doctrine of law of the case is an intervening or contemporaneous change in the law. (*Davies* v. *Krasna, supra,* 14 Cal.3d 502, 507, fn. 5; *Anton* v. *San Antonio Community Hospital* (1982) 132 Cal.App.3d 638, 647 [183 Cal.Rptr. 423]; *Riemar* v. *Hart* (1977) 73 Cal.App.3d 293, 296 [142 Cal.Rptr. 174].)

■ Defendants contend that the exception is applicable here claiming that an intervening change in the law has occurred. They rely on *Williams* v. *State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137].

In *Williams,* plaintiff was injured when a piece of a heated brake drum from a passing truck was propelled through her windshield. Highway patrolmen arrived within a few minutes of the accident. Plaintiff claimed that the patrolmen were negligent in failing to test for the heat of the object which struck her, to secure the names of witnesses, and to attempt investigation or pursuit of the owner or driver of the truck.

The court concluded that the complaint did not state a cause of action. It was pointed out that in the absence of a special relationship, a person who has not created a peril has no duty to come to the aid of another and that the State Highway Patrol has the right but not the duty to investigate accidents. It was also pointed out that cases had denied recovery for injuries caused by the failure of police personnel to respond to requests for assistance, to investigate properly or to investigate at all when the police had not induced reliance on a promise, express or implied, that they would provide protection. The court rejected *Clemente I* stating that the duty to obtain the motorcyclist's name as pleaded in that case was "based solely" on the fact of dependence. (34 Cal.3d at pp. 23-27.)

The court also concluded that under the good Samaritan doctrine the Highway Patrol may have a duty to members of the public to exercise due care when the patrol voluntarily assumes a protective duty toward a certain member of the public and undertakes action on behalf of that member thereby inducing reliance, when an express promise to warn of a danger has induced reliance, or when the actions of the patrol place a person in peril or increase the risk of harm. The court specifically recognized that a duty of care may arise when the conduct of a patrolman in a situation of dependency results in detrimental reliance on him for protection. (34 Cal.3d at pp. 23-25.) The court discussed *Mann* v. *State of California, supra,* 70 Cal.App.3d 773 (34 Cal.3d at p. 25) which was, as we have seen, the case relied upon in *Clemente I. Mann* was characterized as a case where the officers took "affirmative steps to provide assistance, lulling the injured parties into a false sense of security and perhaps preventing other assistance from being sought." (34 Cal.3d at p. 25.)

Although *Williams* rejected *Clemente I,* it does not establish that Officer Loxsom did not have a duty to exercise care in his investigation to protect plaintiff. To the contrary, *Williams* held that the conduct of a patrolman in a situation of dependency resulting in detrimental reliance may give rise to a duty of care and recognized that there may be a duty to refrain from conduct which prevents others from giving assistance. The record herein shows that the officer spoke to the drivers of the van and motorcycle and that there were a number of bystanders assisting plaintiff after the accident who could have obtained the drivers' names and license numbers. *Williams* does not preclude liability where the officer's conduct prevents other assistance, and thus it does not constitute a change in the law warranting rejection of the law of the case that Officer Loxsom could have a duty to exercise care.

In the circumstances of the instant case, it has not been shown that application of the doctrine of law of the case will result in an unjust decision. First, the parties went to trial prior to *Williams* and presented evidence with the understanding that the officer's liability would be governed by the standard set forth in *Clemente I.* Secondly, *Clemente I* did not misapply prior law in a way which resulted in "substantial injustice." Although *Williams* served to clarify what the duties of a highway patrol officer were under a given set of circumstances, our opinion in that case recognized the possibility that such an officer might owe a member of the public a duty of care based on conduct like that shown here.

III. INSTRUCTIONAL ERROR—LIABILITY PHASE

Because we have concluded that *Clemente I* remains law of the case, we reject defendants' contention that the court's instruction following *Clemente I* was erroneous.

Defendants also contend that the trial court erred in instructing the jury: "If you find that defendant Arthur Loxsom violated any provisions of the California Highway Patrol Accident Investigation Manual and that such violation was a legal cause of injury to the plaintiff, you will find that such violation was negligence." Defendants contend that this instruction was an erroneously given negligence per se instruction.

According to the testimony, the manual was prepared for and used in conjunction with courses given at the police academy.[1] Officer Loxsom testified that he kept a copy of the manual in his locker and referred to it on occasion. The manual was followed by most, if not all, departments. Some law enforcement agencies compiled their own manuals. The California Highway Patrol manual contained guidelines for accident investigations. For example, it stated that a patrolman should impartially record facts in order to have a complete unbiased record should civil litigation occur. Plaintiff's expert, a former commissioner of the Highway Patrol, testified that the manual sets a standard of practice, applicable regardless of whether the accident occurred within the primary jurisdiction of the Highway Patrol, freeways and roads in unincorporated areas. The defense offered testimony by the deputy commissioner that the provisions were applicable to the patrol's primary jurisdiction but were not applicable to city streets.

■ Plaintiff argues that the instruction given was not erroneous under the law as stated in *Peterson* v. *City of Long Beach* (1979) 24 Cal.3d 238 [155 Cal.Rptr. 360, 594 P.2d 477], because the manual contained regulations having the force of law. In *Peterson* this court held that the presumption of negligence found in Evidence Code section 669 applied to a police department manual.[2] Evidence Code section 669 provides in relevant part: "(a) The failure of a person to exercise due care is presumed if: [¶] (1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The

---

[1]The foreword to the manual used at trial stated: "This publication has been prepared as a basic training manual in the field of accident investigation for cadets at the California Highway Patrol Academy. It is intended to supplement classroom instruction rather than serve as a complete text in itself. In addition, it is designed to serve as a ready reference for investigators in the field. [¶] Success in the field of accident investigation requires continued study and research to keep abreast of new techniques and to refresh the memory of the investigator. It is hoped that use of this publication will awaken the desire for further study."

[2]The instruction commonly given when it is determined that the violation of a regulation may have been the proximate cause of an injury of the type which the regulation is meant to protect against is BAJI No. 3.45. This instruction follows the language of Evidence Code section 669.

person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted. . . ."

In *Peterson* we concluded that the police department regulations regarding use of deadly force were regulations within the meaning of the broad provisions of Government Code section 811.6[3] because the manual was promulgated by the city manager and the police chief acting as heads of a public entity,[4] the provision in question contained words of command as well as detailed requirements, and the regulations had the force of law. (*Peterson v. City of Long Beach, supra,* 24 Cal.3d 244, 246.)

Defendants argue that *Peterson* is distinguishable because the language of the Highway Patrol Accident Investigation Manual consists of primarily permissive language and does not have the force of law. While the language of the manual leaves much to the discretion of the officer in determining what steps to take,[5] it also identifies the steps to be considered and the concerns which should motivate the officer in exercising his discretion. Obviously, an officer who fails to exercise the discretion vested in him—simply ignoring some of the steps to be taken without considering them—would be

---

[3]Government Code section 811.6 defines a regulation as "a rule, regulation, order or standard, having the force of law, adopted by an employee or agency of the United States or of a public entity pursuant to authority vested by constitution, statute, charter or ordinance in such employee or agency to implement, interpret or make specific the law enforced or administered by the employee or agency."

[4]Vehicle Code section 2402 empowers the commissioner to "make and enforce such rules and regulations as may be necessary to carry out the duties of the department. Rules and regulations shall be adopted, amended or repealed in accordance with the Administrative Procedure Act, commencing with Section 11370 of the Government Code."

[5]The manual contains provisions such as the following: "VALUE OF A FIXED PROCEDURE [¶] Some type of fixed procedure is extremely valuable in accident investigation. It is not intended that this should serve as a limitation of the investigator's actions. *It should be flexible.* Steps should be taken as conditions warrant, rather than by rote. By realizing the need for a fixed procedure, the investigator will use it as a sort of mental check list. It will make the task easier for the officer, assist in determining the cause and gathering data, tend to make sure that nothing is overlooked in the investigation, give a definite starting point, and help to prevent duplication of effort. . . . [¶] PROTECTION OF LIFE AND PROPERTY [¶] In a normal accident investigation there are various steps which may be conveniently grouped under the broad heading of protection of life and property. Not all of these steps will be required in all accident investigations, nor will they always be done in any particular order. The important thing for the investigator to remember is that each investigation should be evaluated in the light of each of these steps, assigning top priority to that which in each instance is most important. The best procedure is a planned procedure which can be adapted to each event. . . . [¶] The arrival of the investigator is necessary to protect the scene and other traffic, preserve evidence which might be lost, and in some cases to save life by applying first aid. Another accident may occur because the highway is obstructed. Traffic congestion is usually present, and the investigator must attempt to restore normal vehicular movements."

subject to disciplinary action, and we are satisfied that the regulations are not merely permissive.[6]

Defendants next urge that the instruction was erroneous because it did not specify particular provisions of the manual. However, plaintiff offered such instructions, and defendants objected. Any error was invited error. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 266, p. 4257.)

■ Defendants also urge that the instruction as given effectively told the jury that the manual was applicable to establish the standard of care thereby erroneously withdrawing from the jury the issue disputed by the expert testimony whether the manual was applicable to accidents on city streets. The instruction given does not expressly state that the provisions of the manual are applicable to accidents on city streets. The negligence per se instruction followed instructions that told the jury that the Highway Patrol's jurisdiction extended throughout the state, that its primary jurisdiction was on highways and freeways within incorporated areas and that patrol officers had the right but not the duty to investigate accidents. Although the expert testimony was in conflict as to the applicability of the manual to an accident on city streets, defendants did not request an instruction telling the jury to disregard the manual if it found that it was applicable only to accidents within the patrol's primary jurisdiction. While there may be some ambiguity in the form of the instruction permitting an inference that the manual's provisions were applicable to the accident, the language permitted the jury to reject the instruction if it concluded that the manual was not applicable to accidents on city streets. The language was "[i]f you find that defendant Arthur Loxsom violated the provisions," and if the jury had agreed with the defense expert that the manual was not applicable, it would not find that Loxsom violated its provisions. We conclude that the instruction did not withdraw the issue of the applicability of the manual.

IV. Improper Argument

■ During argument at the end of the liability phase, plaintiff's counsel made two references to the extent of plaintiff's injuries. Following objections from the defendants the court admonished the jury to ignore counsel's remarks regarding the physical condition, except to the extent that his physical condition was presented in that phase of the trial. After the second

---

[6]Upon petition for rehearing, defendant contended that the California Highway Patrol Accident Investigation Manual was not adopted in accordance with the Administrative Procedure Act (see fn. 4) and that, therefore, it did not have the force of law. This contention is made for the first time on appeal on petition for rehearing and, whatever its merits, is untimely. (Rule 29, subd. (b), Cal. Rules of Court.)

remark the defendants moved for a mistrial and now assert that the motion was denied erroneously.

Defendants' argument is without merit. ■ A mistrial may be granted because of "any misconduct or irregularity that either legally or practically prevents the trial from proceeding or prevents either party from having a fair trial." (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 130, p. 2954.) Misconduct by counsel may be a ground for a new trial. ■ Although plaintiff's counsel should not have referred to the injury in closing argument, we cannot say that these two isolated references prevented defendants from having a fair trial. The trial court properly admonished the jury to disregard counsel's remarks, thereby eliminating any prejudice which the remarks may have caused.[7]

## V. CONTRIBUTORY NEGLIGENCE

■ ■ Defendants contend that the trial court erred in failing to instruct the jury on the issue of plaintiff's contributory negligence. They argue that the evidence at trial supports an inference that plaintiff was negligent in crossing the street and negligent in ignoring his physician's advice to wear a helmet to protect himself against a head injury.

Plaintiff had been injured prior to the January 27, 1975, accident. Dr. Anselen testified that he had suffered a linial fracture and an epidural hemotoma. He underwent surgery for this condition during which time some unspecified portion of his left skull and the hemotoma were removed. Dr. Anselen explained that plaintiff was left with the dura, a tough fibrous matter, covering his brain. In Dr. Anselen's opinion, plaintiff suffered a mild to slight injury and was in fairly good condition following the surgery.

Plaintiff was cautioned by his physician to wear a helmet because a blow to that side of his head could result in a severe brain injury. In Dr. Anselen's view, the helmet was meant "to protect him from any falling object that would hit him on the area that he didn't have a skull, because the skull was removed and to protect him from any small object like a stone or maybe the fist of a friend." Dr. Anselen's review of the medical records indicated to him that plaintiff was in good shape prior to the accident with the motorcyclist and needed only a cranioplasty (procedure to insert metal plate in skull) before he could return to work. In Dr. Anselen's opinion, plaintiff

---

[7]Contrary to defendants' suggestion, the admonishment given was not confusing because it told the jury to ignore counsel's remarks but not the evidence of plaintiff's physical condition which had been introduced to demonstrate the extent of his injuries at the accident scene.

could have full employment. He opined that approximately 10 percent of his present condition was due to the past injury.

As a result of the second accident plaintiff suffered an intracereberal hematoma—an injury more severe than that suffered in his previous accident. Upon questioning by counsel for the defense, Dr. Anselen indicated that the helmet would have protected against "penetrating missiles" but not necessarily falls. No evidence was presented regarding the location of the second blow or whether, in fact, a helmet would have protected him against the type of injury which he suffered. It was also unclear from the testimony what *type* of helmet was to be worn. At one point it was described as a football helmet, at another, a combat helmet. Since the physician who prescribed the helmet did not testify, there was no clarification of this point.

 We are satisfied that the evidence was insufficient to warrant a finding that the helmet would have prevented injury. The purpose of the helmet was to prevent injuries from missiles rather than falls. In the absence of testimony regarding the type of helmet to be worn and whether the helmet would have protected against the injury suffered, the jury could only speculate as to the effect of the failure to wear the helmet. The trial court did not err in refusing to give contributory negligence instructions based on the absence of the helmet.

 The defendants also sought instructions which would have told the jury to find that the plaintiff was guilty of contributory negligence if he failed to keep an adequate lookout for his safety while crossing the street. The only testimony regarding this issue came from Officer Loxsom who stated that he was told by the van driver that plaintiff had begun crossing the street, that he had to stop in order to permit plaintiff to cross, and that Clemente could not see the motorcycle because the van blindsighted him. In the absence of evidence that plaintiff observed the motorcycle and was aware it would not "stop," plaintiff was not negligent in assuming that other vehicles would stop as the van had. (*La Manna* v. *Stewart* (1975) 13 Cal.3d 413, 425 et seq. [118 Cal.Rptr. 761, 530 P.2d 1073]; *Schmitt* v. *Henderson* (1969) 1 Cal.3d 460, 463 et seq. [82 Cal.Rptr. 502, 462 P.2d 30].)

VI. DAMAGES

 Defendants next contend that the trial court erred in refusing to instruct the jury that "[i]n order to recover damages from the state for negligence of a California Highway Patrol officer in the investigation of an accident which deprives plaintiff of a lawsuit, the plaintiff must establish that the officer was negligent, but also must establish that but for such negligence, the lawsuit would have resulted in a collectible judgment in

plaintiff's favor." Defendants argue that such an instruction was proper under *Campbell* v. *Magana* (1960) 184 Cal.App.2d 751 [8 Cal.Rptr. 32]. They also argue that they should have been permitted to present evidence regarding the average insurance carried by motorcyclists in California.

In the present case, the jury was instructed that in order to find defendant liable for the loss of the opportunity to sue the motorcyclist, plaintiff had to show that the motorcyclist was in fact negligent. Defendants seek to impose the further requirement that plaintiff demonstrate that any judgment secured from the motorcyclist would have been collectible.

 In general, one who has been tortiously injured is entitled to be compensated for the harm and the injured party must establish "by proof the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit." (Rest.2d Torts, § 912, p. 478.) However, "[t]here is no general requirement that the injured person should prove with like definiteness the extent of the harm that he has suffered as a result of the tortfeasor's conduct. It is desirable that responsibility for harm should not be imposed until it has been proved with reasonable certainty that the harm resulted from the wrongful conduct of the person charged. It is desirable, also, that there be definiteness of proof of the amount of damage as far as is reasonably possible. It is even more desirable, however, that an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered." (Rest.2d Torts, § 912, com. a, at p. 479.)

If plaintiff's inability to prove his damages with certainty is due to defendant's actions, the law does not generally require such proof. (See, e.g., *Zinn* v. *Ex-Cell-O Corp.* (1944) 24 Cal.2d 290 [149 P.2d 177]; *Natural Soda Prod. Co.* v. *City of L. A.* (1943) 23 Cal.2d 193 [143 P.2d 12], cert. den. (1944) 321 U.S. 793 [88 L.Ed. 1082, 64 S.Ct. 790]; *Pacific Steam Whaling Co.* v. *Alaska Packers' Ass'n* (1903) 138 Cal. 632 [72 P. 161]; *Elsbach* v. *Mulligan* (1943) 58 Cal.App.2d 354 [136 P.2d 651]; see also *Compensation for Lost Profits in California Personal Injury Actions* (1954) 7 Stan.L.Rev. 97; cf. *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756, 769-775 [91 Cal.Rptr. 745, 478 P.2d 465].)

 The defendants' reliance on *Campbell* v. *Magana, supra,* 184 Cal.App.2d 751 is misplaced. In *Campbell* plaintiff sued her attorney for malpractice. In evaluating plaintiff's claim the court stated: "[O]ne who establishes malpractice on the part of his attorney . . . must also prove that careful management of [the lawsuit] would have resulted in recovery of a favorable judgment and collection of same, or, in case of a defense, that

proper handling would have resulted in a judgment for the client; . . . and the burden of proof rests on the plaintiff to prove recoverability and collectibility of a plaintiff's claim or ability to establish a defense for a client who has been sued." (*Campbell* v. *Magana, supra,* 184 Cal.App.2d at p. 754.)

Although the legal malpractice situation is somewhat analogous to the cause of action in the present case, there are significant differences which lead to the conclusion that plaintiff should not be required to prove that he would have obtained a collectible judgment. The essence of plaintiff's cause of action here is that the officer's negligence prevented him or anyone else from ascertaining the *identity* of the motorcyclist. In legal malpractice actions the identities of the parties are known and their financial resources ascertainable. Thus, there is no inherent unfairness in limiting plaintiff's recovery to what he or she would have obtained in the absence of the attorney's negligence.

In direct contrast to the legal malpractice situation, nothing is known about the motorcyclist who struck plaintiff. It is not known, for example, whether he was employed by a business with a great deal of insurance, whether he was penniless or whether he had average insurance and many assets. Obviously, plaintiff's inability to prove whether a judgment against the motorcyclist would be collectible is due to defendant's negligence.

The trial court therefore did not err in refusing to give the instruction sought by the defendants. Further, the court did not err in excluding evidence regarding the average insurance carried by motorcyclists in California. In the absence of any particular information regarding the motorcyclist, the fact of insurance was by itself no indication of the type of judgment which plaintiff would have been able to collect had he sued the motorcyclist.

In *Iselin-Jefferson Financial Co.* v. *United California Bank* (1976) 16 Cal.3d 886 [129 Cal.Rptr. 670, 549 P.2d 142], this court observed that it was irrelevant for purposes of a notary's liability whether the person whose signature he had negligently acknowledged was insolvent and thereby unable to pay the accounts which were supposed to have been signed over to the plaintiff. "[I]t does not necessarily follow that a valid judgment against her would have been worthless. A judgment may be enforced for at least 10 years after the date of its issuance (Code Civ. Proc., §§ 681, 685). Any number of fortuitous circumstances might occur within this 10-year period which could render valuable a judgment that was uncollectible at the time of its rendition. The judgment debtor's fortunes may turn. She might, for example, engage in a lucrative business or profession, or inherit substantial monies or properties." (*Iselin-Jefferson Financial Co., supra,* 16 Cal.3d at p. 889-890.) Likewise, in the present case the evidence sought to be intro-

duced would not have been helpful in clarifying whether the plaintiff could collect a judgment immediately or at any time within the statutory period.

## VII. ALIEN STATUS

Defendants also argue that the trial court improperly excluded testimony from plaintiff's wife regarding his citizenship. Such evidence, they contend, was relevant to a determination of his claim for future loss of earnings. Defendants rely upon *Metalworking Machinery, Inc.* v. *Superior Court* (1977) 69 Cal.App.3d 791 [138 Cal.Rptr. 369] claiming that when a plaintiff in a personal injury action is an illegal alien, the relevant standard for compensation of lost future earnings are those which might be earned in the country of the plaintiff's lawful citizenship. In *Metalworking Machinery, Inc., supra,* defendants sought admissions from plaintiff during discovery, relating to his citizenship. The trial court issued a blanket order denying the request, and the Court of Appeal issued a writ of mandate compelling the court to vacate its order. In so doing, the Court of Appeal concluded that the requests were relevant to the subject matter of the action and could lead to the discovery of admissible evidence. (*Metalworking Machinery, Inc., supra,* 69 Cal.App.3d at p. 794.) On that basis the court concluded that a blanket order denying discovery was an abuse of discretion. (*Ibid.*)

We cannot say that in the instant case the trial court erred in refusing to permit questioning of plaintiff's wife regarding her husband's citizenship. Plaintiff had been gainfully employed in this country prior to his two accidents, there was no evidence that he had any intention of leaving this country and the speculation that he might at some point be deported was so remote as to make the issue of citizenship irrelevant to the damages question. The trial court properly concluded that plaintiff's wife was probably incompetent to testify to her husband's legal status in this country and that such testimony, even if marginally relevant, was highly prejudicial.

## VIII. THE WORKERS' COMPENSATION APPEALS BOARD FINDINGS AND ORDER

Defendants attempted to place in evidence a Workers' Compensation Appeals Board (WCAB) order denying reconsideration and order granting an award to plaintiff. The trial court ruled that these documents could not be admitted because even though res judicata, they were prejudicial and contained hearsay.

The defendants contend that the trial court failed to give res judicata effect to the findings and orders of the WCAB. Specifically the de-

fendants point to a WCAB order and opinion denying reconsideration which stated that "[t]he above evidence [recitation of facts from the report of a doctor] along with the remainder of medical evidence in the record indicates to us that applicant would have been permanently disabled as a result of this industrial injury even if the hit and run accident of January 27, 1975 had never occurred." The findings also state that the May 25, 1974, injury caused "temporary total disability beginning May 25, 1974, to and including March 18, 1976" and also that "[t]he injury caused permanent disability of 100%." Defendants argue on the bases of these orders and findings that no testimony should have been permitted which indicated anything other than the fact that plaintiff was 100 percent disabled prior to the January 27, 1975, accident.

■ It is well established that a WCAB finding or order is res judicata in any subsequent proceeding if the issue decided in the prior adjudication is identical to the one presented in the action in question, if there was a final judgment on the merits, and if the party against whom the plea was asserted was a party or in privity with a party to the prior adjudication. (2 Witkin, Summary of Cal. Law (8th ed. 1973) Workmen's Compensation, §§ 263-264, pp. 1066-1067; *Dakins v. Board of Pension Commissioners* (1982) 134 Cal.App.3d 374, 381-382 [184 Cal.Rptr. 576].) However, where there is a new action involving a different cause of action the doctrine of collateral estoppel applies. The effect of collateral estoppel is that the former judgment is conclusive as to issues litigated or which could have been raised and litigated. (*Dakins, supra,* at p. 385.)

■ The defendants misperceive the nature of the WCAB disability rating and the trial court's ruling. The rating is a combination of numerous factors and measures injury as well as the worker's ability to engage in gainful employment, and is done pursuant to numerous grids. "In determining the percentages of permanent disability, account shall be taken of the nature of the physical injury or disfigurement, the occupation of the injured employee, and his age at the time of such injury, consideration being given to the diminished ability of such injured employee to compete in an open labor market." (See Lab. Code, § 4660, subd. (a); 1 Herlick, Cal. Workers' Compensation Law (3d ed. 1984) § 7.1, p. 180.) Further, courts have recognized the legal fiction of the 100 percent disability rating (see, e.g., *Smith v. Industrial Acc. Com.* (1955) 44 Cal.2d 364 [282 P.2d 64]; *Dahlbeck v. Industrial Acc. Com.* (1955) 135 Cal.App.2d 394 [287 P.2d 353].) The WCAB findings and orders did not, therefore, conclusively establish that plaintiff's physical condition was not worsened by the hit-and-run accident.

■ Defendants' final contention is that the WCAB reports, although not res judicata on the issue of disability, were admissible under Evidence

Code section 1280 which provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made by and within the scope of duty of a public employee; [¶] (b) The writing was made at or near the time of the act, condition, or event; and [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness." Although the order itself may have been admissible under this provision, the trial court correctly ruled that the report contained inadmissible hearsay, e.g., quotations from doctors' reports. The court correctly perceived that the documents were hearsay, that plaintiff may not have had an opportunity to cross-examine the authors, and even if the documents were admissible, they were more prejudicial than probative (Evid. Code, § 352). Understanding of the order and documents would require extensive testimony as to workers' compensation practices. Since the jury heard testimony regarding plaintiff's physical condition following his first and second accidents, we cannot say that the trial court abused its discretion in refusing to admit the order and reports.

The judgment is affirmed.

Bird, C. J., Mosk, J., and Reynoso, J., concurred.

**KAUS, J.**\*—I concur in the result and in all parts of the court's opinion, except—if I read it correctly—its view of the impact of *Williams* v. *State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137], on the law of the case as laid down in *Clemente I*. The court makes a valiant effort to reconcile the two decisions but, with all respect, it does not quite work. Of course *Williams* does not preclude liability where the officer's conduct prevents other assistance, but there is no evidence here that this was the case. At most, the situation was such that had trial counsel known that such proof was essential, he might have been able to produce it. The real—and only—point is that *Clemente I* did not require such proof and *Williams* was not decided until after the trial of this case. Under such circumstances, refusal to apply the doctrine of the law of the case would be most unfair. Just as that doctrine will not be adhered to "where its application will result in an unjust decision" (*DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 179 [18 Cal.Rptr. 369, 367 P.2d 865]), it should not be laid aside where to do so would be manifestly wrong.

Grodin, J., concurred.

---

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

**LUCAS, J.**—I respectfully dissent. The majority, after correctly describing the doctrine of "law of the case" and the exceptions thereto, promptly ignores its own description. When law of the case might apply, "[t]he principal ground for making an exception to the doctrine . . . is an intervening or contemporaneous change in the law. [Citations.]" (*Ante,* p. 212.) What could be a clearer intervening change in the law than a Supreme Court decision expressly disapproving the prior Court of Appeal holding in the same case on the same issue?

In *Williams* v. *State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137], we summarized the decision in *Clemente* v. *State of California* (1980) 101 Cal.App.3d 274 [161 Cal.Rptr. 799] (hereinafter *Clemente I*) as one in which the Court of Appeal had found liability even in the absence of an allegation that "the officer's investigation caused plaintiff not to undertake one of his own." (*Williams,* 34 Cal.3d at p. 26.) That holding followed the finding that the pedestrian was "*dependent* on the highway patrolman." (*Ibid.,* italics in original.)

Our analysis in *Williams* concluded that more was required before a cause of action could be stated against a police official and we, therefore, *expressly disapproved Clemente I* to the extent it was inconsistent with our reasoning. (34 Cal.3d at p. 28, fn. 9.) We concluded instead that the general rule that "one has no duty to come to the aid of another" generally applied. (*Id.,* at p. 23.) Only when a "special relationship arises" may liability be imposed. (*Id.,* at p. 24.) Thus, "when the state, through its agents, voluntarily assumes a protective duty toward a certain member of the public and undertakes action on behalf of that member, thereby inducing reliance, it is held to the same standard of care as a private person or organization. [Citations.]" (*Ibid.*) However, where allegations amount only to nonfeasance without assertions that the officer in some manner promised to undertake the tasks left undone or otherwise induced reliance on the part of the plaintiff who was in any manner prevented from acting, no duty exists and no liability will be imposed.

In other words, dependency *alone* does not create a relationship which gives rise to a duty to assist or protect the injured person. In *Williams,* the defendant had not alleged that "the officers assured her, either expressly or impliedly that they would do any of the acts she faults them for not doing, [nor were there] allegations that they conducted themselves in such a manner as to warrant reliance upon them to do the acts which the plaintiff alleges they should have done, nor finally is there any hint that they prevented plaintiff from conducting an investigation of her own." (34 Cal.3d at p. 27, fn. omitted.) Similarly, in this case no such assertions were made.

In his petition before this court, plaintiff stated that because this case had been tried under the authority of *Clemente I,* "there was no need to plead or prove that the officer's conduct prevented other assistance from being sought, or caused plaintiff (or someone acting on his behalf) not to undertake an investigation of his own. [¶] That *issue* was *not* present either at the trial or appellate level in this proceeding." He then went on to ask us nonetheless to match the facts adduced against the *Williams* standard and to conclude that the facts were sufficient to permit him an opportunity *to amend and retry the case* which had *not* previously addressed this aspect of the officer's conduct.

The parties proceeded in the belief that *Clemente I* stated the applicable law. Even under that approach, evidence regarding the effects of the officer's conduct as are asserted here would have been relevant and of assistance to the plaintiff. As the Court of Appeal in the instant case stated, unlike the situation in *Williams,* "plaintiff in the present case has filed four amended complaints, had a jury trial on the merits, and has still been unable to establish any of the required elements necessary to establish a duty of care owed by defendant State. Clearly, further action would be futile." Accordingly, I would reverse the judgment.

I also cannot agree with an additional holding of the majority. Specifically, my colleagues find no error in the trial court's instruction to the jury that: "If you find that defendant Arthur Loxsom violated any provisions of the California Highway Patrol Accident Investigation Manual and that such violation was a legal cause of injury to the plaintiff, you will find that such violation was negligence." It was disputed whether the manual was applicable here, and the parties presented conflicting testimony as to whether it applied only to the patrol's primary jurisdiction, namely, roads and freeways in unincorporated areas, or whether it also applied to city streets such as the one where the accident at issue here occurred.

Defendants contend that the instruction essentially informed the jury that the manual *was* applicable, thus removing from it the disputed issue of its role in the context of city streets. As the majority notes, this negligence per se instruction followed instructions telling the jury "that the Highway Patrol's jurisdiction extended throughout the state, that its primary jurisdiction was on highways and freeways within incorporated areas and that patrol officers had the right but not the duty to investigate . . . ." (*Ante,* p. 216.) Conceding that "there may be some ambiguity in the form of the instructions permitting an inference that the manual's provisions were applicable to the accident" (*ante,* p. 216), the majority nonetheless concludes that it was proper because it "permitted the jury *to reject the instruction* if it

concluded that the manual was not applicable to accidents on city streets." (*Ibid.,* italics added.)

I find that result untenable. The core of the majority's analysis amounts to the conclusion that, first, the instruction, which *required* a finding of negligence per se, was improperly ambiguous on its face. However, despite the lack of instructions on the precise and necessary condition precedent, namely, *whether the manual applied,* the majority sweepingly assumes the jury could somehow find that the mandatory and directive language of the instruction itself allowed the jury to disregard it. The first standard instruction given to the jury included the words "It is my duty to instruct you in the law that applies to this case and you must follow the law as I state it to you." Yet, the majority finds the challenged instruction proper on an unwarranted and illogical assumption that the jurors ignored the fundamental direction that they follow the law as stated and instead intuited from the language of the specific instruction that it could be disregarded. Such a conclusion flies in the face of generally accepted principles used for constructing jury instructions.

Because this instruction told the jury to find negligence per se if the manual was violated, without requiring it first to find that the manual was applicable, the error was prejudicial. It removed a *significant and disputed* fact from the jury's purview. On this basis alone, I would reverse and remand.[1]

Appellants' petition for a rehearing was denied January 23, 1986, and the opinions were modified to read as printed above. Grodin, J., Lucas, J., and Panelli, J., were of the opinion that the petition should be granted.

---

[1]In footnote 6 of the majority opinion (*ante,* p. 216) the majority asserts that in the petition for rehearing defendant contended for the first time on appeal that the California Highway Patrol Accident Investigation Manual was not adopted in accordance with the Administrative Procedure Act and it therefore did not have the force of law. I find this assertion disingenuous at best. It is clear that the effect of the manual was a major issue in this case throughout and in fact the requirement of compliance with the Administrative Procedure Act was argued in the trial court. The trial court found at one point that the regulation *did not have the force of law* yet still gave the disputed instruction. Defendant, as appellant, may therefore have reasonably determined that it need not readdress the issue of whether the manual had the force of law on appeal; it was only necessary for it to explain why, once having made that finding, the trial court erred in giving the instruction that it did.

I think it is clear that the court erred in its original disposition of this issue, and I think that the issue was clearly and sufficiently raised such that we should acknowledge our error and grant rehearing. I cannot, however, speak further to the merits of the issue because the timing of the order modifying the majority two days before our jurisdictional time finally elapses, leaves me and those also voting for rehearing with no time adequately to explore the question or to prepare a responsive opinion.